American Casualty Company of Reading, Pa., Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

224

Argued December 18, 1981, before Judges MENCER, CRAIG, and MACPHAIL, sitting as a panel of three.

*Edward E. Knauss, IV, Metzger, Wickersham, Knauss & Erb,* for petitioner.

*Peter Shelley,* Assistant Counsel, for respondent.

OPINION BY JUDGE MACPHAIL, March 10, 1982:

American Casualty Company of Reading, Pennsylvania (Petitioner) appeals from an adjudication of the Environmental Hearing Board (EHB) which held that the Department of Environmental Resources (DER) properly forfeited five bonds issued by Petitioner as surety to the Commonwealth of Pennsylvania to guarantee compliance by Blue Coal Corporation (Blue Coal) with the requirements of the Anthracite Strip Mining and Conservation Act (Anthracite Act).[1]

The complex facts in this case are, for the most part, undisputed. In 1966[2] and 1967 Blue Coal became the operator under four strip mining permits issued pursuant to the Anthracite Act by the Department of Mines and Mineral Industries (DMMI), the predecessor

---

[1] The Act of June 27, 1947, P.L. 1095, *as amended,* 52 P.S. §§681.1-681.22. The Anthracite Act has been repealed insofar as it is inconsistent with the Surface Mining Conservation and Reclamation Act (SMCRA), Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. §§1396.1-1396.25. The partial repeal took effect January 1, 1972, the effective date of the Act of November 30, 1971, P.L. 554 which substantially amended the SMCRA to make it applicable to anthracite as well as bituminous coal surface mining.

[2] Two of these permits were originally issued to Glen Alden Corporation in 1963-64. Blue Coal acquired Glen Alden's assets in 1966 and took over responsibility for the two permits.

agency to DER.[3] Section 6 of the Anthracite Act, 52 P.S. §681.6, requires that for each operation the operator filed a bond payable to the Commonwealth conditioned upon the operator's faithful performance of *all* the requirements of the Act. At issue in the instant case are five bonds filed pursuant to Section 6. The bonds were originally executed between 1963 and 1967 with face amounts ranging from the statutory minimum of $5000 to $9500.[4]

Mining under each of the four permits was performed by Blue Coal, which frequently contracted with other companies for labor and equipment. It is undisputed that all of the areas covered by the bonds here at issue were affected by the mining activities. The record also establishes that over a period of time each of the permits was amended to increase the acreage to be mined, which in turn required some additional bonding. Pursuant to Section 11 of the Anthracite Act, 52 P.S. §681.11, the permits required backfilling of the permitted areas which was to be accomplished within six months after the operation was completed or abandoned.

Notice of the forfeitures here at issue was sent to Petitioner on or about November 21, 1978. The forfeiture action was taken due to the failure of Blue Coal to complete reclamation work in the bonded areas. Prior to the actual forfeitures, DER had taken

---

[3] DMMI administered the Anthracite Act until the powers and duties of DMMI were transferred to DER by Section 1901-A of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, added by Section 20 of the Act of December 3, 1970, P.L. 834, 71 P.S. §510-1.

[4] When Blue Coal acquired the assets of Glen Alden Corporation in 1966 the relevant bonds were amended and Blue Coal was added as a principal thereto. Petitioner issued one bond on permit 30-6 with a face value of $5000, two bonds on permit 30-21 with face values of $5000 and $9500, one bond for $5000 on permit 30-48 and one bond for $6000 on permit 30-88.

various actions including verbal and written orders issued during 1973 to Blue Coal to increase backfilling work and to prevent the removal of backfilling equipment from the permit areas before reclamation was completed. When reclamation work again fell behind schedule and it was rumored that Blue Coal was being liquidated, DER instituted an action in equity in the Luzerne County Court of Common Pleas. As a result of that action, counsel for DER and Blue Coal entered into a stipulation providing for reclamation to be performed by Blue Coal and a contractor by December 31, 1974. The reclamation work was not completed as agreed and a contempt petition was filed by DER with the Court of Common Pleas on April 14, 1975. Approximately two months later, ownership of Blue Coal was transferred to new owners who in March or April of 1976 were granted a "moratorium" on their obligations under the stipulation to allow time for the corporation to generate operating capital which would enable further reclamation. When, in 1978, it became clear that reclamation would not be completed by Blue Coal, which had declared bankruptcy, and that the permits were not to be transferred to a solvent operator, DER declared the bonds here at issue forfeited. Petitioner appealed from the forfeiture action to the EHB which found the forfeitures proper and the instant appeal was taken.

Four issues have been raised for our consideration: 1) whether DER's forfeiture action was timely; 2) whether Petitioner's obligation has been discharged by reason of DER's alleged negligence in the enforcement of the provisions of the Act; 3) whether Blue Coal's use of contract miners has discharged Petitioner's obligation as surety on the bonds and 4) whether the bonds at issue are indemnity bonds or penal bonds. Each of these issues was raised before the EHB and in each instance, rulings favorable to DER were entered.

Before we can resolve the first issue presented we must determine whether the bonds should be interpreted in light of the provisions of the Anthracite Act or those of the amended Surface Mining Conservation and Reclamation Act (SMCRA) which became effective January 1, 1972 and repealed the Anthracite Act insofar as it was inconsistent with SMCRA.[5] It is undisputed that the five bonds at issue were executed before the amendments to SMCRA became law. It also appears, however, that pursuant to Section 5 of SMCRA, 52 P.S. §1396.4, Blue Coal applied for and was issued new permits for its operations subsequent to January 1, 1972 and that the Petitioner's existing bonds were used to meet the bonding requirements of SMCRA. There is nothing in the record to indicate that Petitioner had knowledge that the bonds were being used to secure performance under permits issued pursuant to SMCRA. Since the bonds specifically state that they are conditioned on the principal's faithful performance of the requirements of the Anthracite Act and they were not amended to reflect the change of law when the amendments to SMCRA became effective, we agree with the EHB that the Anthracite Act should be used to interpret the bonds.

We also note that both the Anthracite Act and SMCRA require that the bonds be executed on forms prescribed and furnished by the department.[6] *See* Section 6 of the Anthracite Act, 52 P.S. §681.6 and Section 5(d) of SMCRA, 52 P.S. §1396.4(d). When the new permits were issued under SMCRA, we are of the opinion that had DER wanted Petitioner's bonds to reflect the change in law, it could have and should have demanded that new or amended bonds be filed.

---

[5] *See* note 1, *supra*.

[6] Under the Act, the "department" was DMMI; under SMCRA, it is DER.

Having failed to require Blue Coal or the Petitioner to file new bonds, DER cannot now insist that this Court construe the bonds in such manner as to include the provisions of SMCRA.

## I. Timeliness of Forfeitures

The bonds in this case were executed on forms furnished by DMMI. The forms provided that liability on the bonds would continue "for the duration of [strip] mining at the operation registered hereunder" and for five years thereafter, unless earlier released. The parties have stipulated that: with regard to permit 30-6 the extraction of coal ceased *in the area covered by Petitioner's bond* at the end of 1971; with regard to permits 30-21 and 30-88, no coal was extracted from the areas covered by Petitioner's bonds after January, 1971; and there was no coal extracted from permit area 30-48 after January, 1970. The record also establishes, however, that with the exception of permit area 30-48 coal extraction was performed within the permitted areas, although *not on the portions bonded by Petitioner*, at least until the beginning of 1974.

Petitioner argues that since no coal was *extracted* after 1971 from the actual acreage that its bonds covered, the forfeitures which occurred in 1978, more than five years later, were untimely. DER argues that the term "strip mining" should be construed broadly to include reclamation thus rendering the forfeitures timely; the EHB agreed and adopted an interpretation that the five-year period "would seem to run at the earliest from the operator's filing of a completion report" after reclamation as required by Section 15 of the Anthracite Act, 52 P.S. §681.15. Since the only completion report filed in this matter was one filed in 1975,[7] well within five years of the November, 1978

---

[7] A completion report was, in fact, filed for permit area 30-21 on July 28, 1975. That report was later approved by DER as to

forfeitures, the EHB concluded that the forfeitures were timely.

An examination of the language in the bonds at issue here reveals that they are what the law regards as statutory bonds. Thus, the instant bonds recite that

> NOW THE CONDITION OF THIS OBLIGATION IS SUCH THAT IF THE ABOVE bound operator or principal shall faithfully perform all of the requirements of the Act of Assembly, approved June 27, 1947, P.L. 1095, as amended, known as the 'Anthracite Strip Mining and Conservation Act,' then this obligation shall be null and void, otherwise to be and remain in full force and effect in accordance with the provisions of said Act of Assembly and Amendments thereto.

Principles of law applicable to statutory bonds are set forth in 12 Am. Jur. 2d *Bonds* §26 (1964) as follows:

> While a bond is none the less a contract because it is required by statute, statutory bonds are construed in the light of the statute creating the obligation secured and the purposes for which the bond is required, as expressed in the statute. It is a generally accepted principle that the statute which provides for the giving of a bond becomes a part of the bond and imports into the bond any conditions prescribed by the statute but not in fact included in the bond as written. If the statute prescribes the conditions of the bond, they will be read into the bond to determine liability thereunder although the bond does not include all of them. It is presumed that the intention of

---

backfilling, but not as to planting. The two bonds on which Petitioner was surety were consequently released except for $1,000 on Bond No. 484858 and $1,900 on Bond No. 336-1929 to secure the required planting.

the parties was to execute such a bond as the law required. This rule is frequently applied in cases where the principal on the bond applies for and receives the contract, privilege, or benefit authorized by the statute on the condition expressed in the statute that the principal execute a bond in the terms provided by the statute. (Footnotes omitted.)

Reclamation is required under Sections 5, 11 and 14 of the Act, 52 P.S. §§681.5, 681.11 and 681.14. Petitioner contends, nevertheless, that its liability is limited by other language in the bond which reads as follows:

Liability upon this bond shall accrue in proportion to the area of land affected by open pit mining at the rate of five hundred ($500.00) dollars per acre but in no case shall such liability be for an amount less than five thousand ($5,000.00) dollars, as provided in said Act of Assembly as amended, and shall continue thereon for the duration of open pit mining at the operation registered hereunder [sic] for a period of five (5) years thereafter, unless the area of land affected for which liability has been charged against the bond has been backfilled and leveled and reports filed by the inspector certifying that it has been done in the manner prescribed by law....

Petitioner argues that the plain meaning of that language is that once open pit *mining* has ceased within the acreage specified in the bond, the clock begins to run and five years thereafter the bond obligation becomes unenforceable. Such a construction would mean, of course, that Petitioner's guarantee of compliance by Blue Coal with the Act's requirements regarding reclamation would only remain in effect for five years after the actual extraction of coal ceased in

the specific areas bonded by Petitioner. We cannot agree with this interpretation because, in our opinion, both the Act and the bonds require that Petitioner's liability continue until *all* of the requirements of the Act are performed. Furthermore, the general rule is that where the provisions of the bond are capable of two or more meanings, the language is construed most strongly against the obligor. *Commonwealth v. Friedman*, 121 Pa. Superior Ct. 591, 184 A. 672 (1936).

While we must admit that Petitioner's position is not without merit, we, nevertheless, hold that unless and until the bonded area is reclaimed and a certificate filed in accordance with the provisions of the Act, the condition of the bond has not been fulfilled. We hold, accordingly, that EHB did not err when it ruled that the forfeiture proceedings were timely.[8]

## II. Discharge through DER negligence

Petitioner's next argument is that DER should be precluded from collecting on the bonds because of its negligence in failing to enforce the backfilling requirements of the Anthracite Act to the prejudice of Petitioner. EHB held that Petitioner has failed to establish DER's negligence. After a review of the record, we agree. While the enforcement actions taken by DER in the instant case were not entirely successful, we can find no reason to disturb the EHB's conclusion that "DER energetically enforced the Anthracite Act." The actions taken by DER, outlined *infra*, clearly undercut any merit to Petitioner's argument. Furthermore, DER owed Petitioner no duty of active diligence in proceeding against Blue Coal

---

[8] With respect to Petitioner's contention that such an interpretation may extend their liability indefinitely, we note that Petitioner's remedy would be to institute appropriate proceedings to terminate their liability when they would be of the opinion that such liability should be terminated.

beyond what was actually required by the Anthracite Act. *See* 72 C.J.S. *Principal and Surety* §208 (1951). Petitioner has failed to direct our attention to any provision in the Act which, before forfeiture may properly be declared, *requires* enforcement action beyond that taken by DER in this case.

### III. Use of Contract Mining Companies

The third issue before us relates solely to permit areas 30-6 and 30-21. Petitioner contends that Blue Coal had nearly completed reclamation work on those areas covered by Petitioner's bonds when Blue Coal entered into a contract with another mining corporation, Lucky Strike Coal Company, Inc., which corporation redisturbed the bonded areas without Petitioner's knowledge or consent. Petitioner argues that DER dealt with Lucky Strike as a separate operator and that Petitioner's obligations were significantly altered by the involvement of Lucky Strike in the areas covered by the subject bonds. Petitioner contends that it must, therefore, be discharged from its obligation on the three bonds on areas 30-6 and 30-21. We cannot agree.

A careful reading of the stipulations made by counsel for Petitioner and DER at the hearings before the EHB reveal that rough grading had been completed on areas 30-6 and 30-21[9] when they were "reaffected" by Lucky Strike subsequent to August, 1974. The stipulations also make it clear, however, that backfilling and grading have again been accomplished in areas 30-6 and 30-21 and that only planting is needed to satisfy DER requirements. Thus, we are unable to discern how the involvement of Lucky Strike has significantly altered Petitioner's obligation on the

---

[9] This initial grading, interestingly, was also accomplished by a corporation under contract with Blue Coal.

bonds so as to justify its discharge. Moreover, the record is clear that DER looked solely to Blue Coal to perform the requirements of the Anthracite Act under its permits and that DER did not deal directly with the contract operators. Since, as a general rule, some act by the obligee, here DER, as opposed to an act by the principal alone, is necessary to discharge the surety, we conclude that Petitioner's argument must fail. *See* 72 C.J.S. *Principal and Surety* §118 (1951).

## IV. Nature of the bonds

The final issue presented requires a determination of whether the subject bonds are penal or indemnity bonds. The import of the distinction is that if the bonds are penal in nature, damages need not be established in order to recover the full amount of the bond. If the bonds instead are indemnity bonds then DER whould have to prove actual damages sustained in order to collect on the bonds. The nature of the bonds must be determined from the language of the bond as well as the Anthracite Act. *See Commonwealth v. Eclipse Literary and Social Club*, 117 Pa. Superior Ct. 339, 178 A. 341 (1935).

As a general rule, and in the absence of provisions to the contrary, where a bond is given to a public body and is conditioned on compliance with a specific statute, the full penalty of the bond may be recovered in the event of a breach. *Fresh Grown Preserves Corp. v. United States*, 144 F.2d 136 (4th Cir. 1944) and 12 Am. Jur. 2d *Bonds* §44 (1964). The reason for this construction was set forth in *Commonwealth v. J. & A. Moeschlin, Inc.*, 314 Pa. 34, 44, 170 A. 119, 123 (1934) as follows: "[D]amages to the obligee would in such circumstances be difficult or impossible of ascertainment and proof, and hence in such cases it is said

that the parties will be held to have intended that the full sum named should be forfeited."[10]

The Anthracite Act requires the filing of bonds conditioned on the faithful performance of all of the Act's requirements. Section 17 of the Act, 52 P.S. §681.17 provides that:

> If the operator fails or refuses to comply with the requirements of the act as to any area for which liability has been provided in the bond, the Secretary of [DER] shall declare such portion of the bond forfeited.... Such moneys or securities so forfeited and collected shall be used ... to pay the cost of backfilling and other acts required by this act, and the cost of planting as required by ... this act.

As we have noted, *supra*, the obligation set forth in the bond is compliance with all of the requirements of the Act.

There is no dispute that all of the lands covered by the bonds here are in need of further reclamation. We conclude both from the language of the Act and the bonds that the bonds are penal in nature and that DER need not prove damages in order to collect on the bonds. Neither the bonds nor the Act require proof of actual damages sustained prior to collection. Although there can be little doubt that the actual cost of backfilling and planting could be proved in this case, we think the intent of the Anthracite Act is to allow the forfeiture and collection of bonds for the failure to comply with all of the requirements of the Act, which are not limited to backfilling and planting. It is our opinion that the bonds are intended to be

---

[10] We believe that the case of *Pennsylvania Turnpike Commission v. United States Fidelity and Guaranty Co.*, 412 Pa. 222, 194 A.2d 423 (1963) relied upon by Petitioner is inapposite since that case involved the interpretation of an official bond. Liability on an official bond is generally limited to actual damages sustained.

penal, thus not requiring proof of damages actually sustained.

We, accordingly, affirm the EHB.

ORDER

AND Now, this 10th day of March, 1982, the order of the Environmental Hearing Board, dated January 16, 1981, is hereby affirmed.

Judge PALLADINO did not participate in the decision in this case.