Ohio Farmers Insurance Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued January 31, 1983, before Judges ROGERS, WILLIAMS, JR. and CRAIG, sitting as a panel of three.

*Stephen C. Braverman,* with him *John M. Elliott* and *Roy Alan Cohen,* of counsel: *Dilworth, Paxson, Kalish & Kauffman,* for petitioner.

*Peter Shelley,* Assistant Counsel, for respondent.

Opinion by Judge Craig, March 18, 1983:

Ohio Farmers Insurance Company appeals from an Environmental Hearing Board (EHB) adjudication, sustaining a Department of Environmental Resources (DER) action[1] which declared as forfeit $254,750 worth of surety bonds issued by the insurance company and posted by Ralph A. Veon, Inc. (Veon) for five surface mining sites in Little Beaver Township.

Although the EHB did not make findings of fact concerning reclamation conditions at the Veon sites, uncontroverted testimony of record provides a sufficient basis for reconstructing the events which led to DER's forfeiture action.

Veon has been in operation as a surface coal and clay mining company since 1954, first under the control of Ralph Veon and later under the ownership and management of three other individuals.[2] From 1969 until his retirement in January of 1978, DER mining inspector Herbert Strum monitored the Veon pits. Sometime thereafter, John Meehan inspected the sites until 1979, when DER replaced him with Merle Urey.

Inspector Urey first inspected the five Veon sites in 1979, observing that some of the pits were inactive and thus in need of reclamation. He therefore cited

---

[1] DER took its forfeiture action under section 4(h) of the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. §1396.4, which provides in pertinent part:

(h) If the operator fails or refuses to comply with the requirements of the act in any respect for which liability has been charged on the bond, the department shall declare such portion of the bond forfeited, and shall certify the same to the Department of Justice, which shall proceed to enforce and collect the amount of liability forfeited thereon. . . .

[2] Testimony of record indicates that Ralph Veon relinquished ownership of the company in 1977 and ceased to be president and executive officer in 1978.

Veon for backfilling violations and presented it with a reclamation schedule.

By letter dated October 30, 1979 to Veon's president, DER suspended three of the company's mining permits because of backfilling reclamation violations[3] and further ordered the company to cease and desist from all mining activities unrelated to backfilling and restoration at those three sites.[4]

DER did not forward a copy of that October 30, 1979 letter to Ohio Farmers.

On October 31, 1979, Veon filed a voluntary petition of bankruptcy in the United States Bankruptcy Court for the Western District of Pennsylvania.

DER notified Veon's president of its forfeiture decision on February 13, 1980 and sent a copy of that letter to Ohio Farmers.

In its notice of appeal and in its pre-hearing memorandum,[5] Ohio Farmers argued that it has been discharged from any liability on the bonds because Veon's backfilling and reclamation violations were the result of the Commonwealth's alleged failure to (1) monitor Veon's operations and secure compliance with the reclamation laws and (2) notify the surety of violations earlier, when the insurance company al-

---

[3] DER suspended Veon's mining permits 40-9 (Hostettler Pit), 40-16 (Veon Pit) and 40-20 (Lipp Pit).

[4] At the hearing, DER stipulated that Veon had performed the required reclamation on mining sites covered by two surety bonds originally declared forfeit; accordingly, DER rescinded its forfeiture with respect to those two bonds. Ohio Farmers stipulated that Veon had not completed reclamation of the other bonded mining sites which are the subject of this appeal.

[5] We note that section 4(i) of the Act only entitles aggrieved "operators" to lodge an appeal with the EHB concerning any DER decision or action affecting bonds. Thus, we are not sure under what statutory provision Ohio Farmers, as surety, claims a right of appeal. We have no occasion to address the merits of this standing issue, however, because DER did not raise it before the EHB.

legedly could have required Veon to comply with the law and when Veon allegedly possessed the financial resources to do so.[6]

### Discharge Through Negligent Inspection

Relying upon the rule of law that "a surety will be discharged from liability whenever the creditor or obligee does anything prejudicial to the rights of the surety," P.L.E. Suretyship §78, Ohio Farmers contends that for almost two years,[7] from 1978 to 1979, DER failed to enforce section 4.3 of the Act as it was then in effect,[8] and that as a result, DER "materially

---

[6] On appeal to this court, Ohio Farmers argues that we should also consider if (1) the EHB erred by failing to conduct a de novo hearing on the bond forfeiture action taken by DER and if (2) DER has been estopped from declaring the bonds forfeit because it allegedly repudiated a reclamation schedule agreement which, as Ohio Farmers contends, would have resulted in a successful restoration of the bonded sites.

Ohio Farmers has waived both issues under the Administrative Agency Law, 2 Pa. C. S. §703(a), under Pa. R.A.P. 1551, and under 25 Pa. Code §21.51(e), which provides that any objection to DER action not raised by appeal shall be deemed waived unless, upon good cause shown, the EHB agrees to hear that objection.

Here, the insurance company had ample opportunity to raise both issues at the hearing and in a post-hearing brief. As noted by the EHB, however, Ohio Farmers did not file a post-hearing brief, as ordered by the hearing examiner.

[7] The two years in question presumably refer to the period between 1977, when Mr. Veon sold his interest in the mining company, and 1979, when Inspector Urey visited the Veon sites.

[8] The legislature amended section 4.3 in 1980 to read:

The department shall have the right to enter upon and inspect all surface mining operations for the purpose of determining conditions of health or safety and for compliance with the provisions of this act, and all rules and regulations promulgated pursuant thereto. The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act. Such orders shall include, but shall not be limited to, orders modifying, suspending or revoking permits, licenses and orders requiring persons to cease op-

prejudiced'' the rights of the insurance company. We disagree.

Section 4.3 of the Act provided, in pertinent part: Any mine conservation inspector directed by the department shall have the right to enter upon and inspect all stripping operations for the purpose of determining conditions of safety and for compliance with the provisions of this act, and all rules and regulations promulgated pursuant thereto. Should an operator fail to comply with the requirements of this act, or any rules or regulations promulgated thereto, the mine conservation inspector shall report the matter to the secretary who shall immediately notify the operator by registered mail of such failure. Unless the operator complies with the act, and such rules and regulations, within thirty (30) days from the receipt of such notice, the secretary may, after hearing and final determination, suspend the open pit mining operator's license of the operator and issue a cease and desist order requiring the operator to immediately cease open pit mining within this Commonwealth until such time as it is determined by the secretary that the operator is in full compliance. A mine conservation inspector shall have the authority to order the immediate stopping of any operation that is started by an unlicensed oper-

---

erations immediately. The right of the department to issue an order under this act is in addition to any penalty or requirement which may be imposed pursuant to this act. If the department intends to revoke or suspend a license, it shall provide an opportunity for an informal hearing before suspending or revoking the license. Fifteen (15) days notice of the informal hearing shall be given unless the department determines that a shorter period is in the public interest.

Act of October 10, 1980, P.L. 835, 52 P.S. §1396.4c.

ator, or without the operator thereof having first obtained a permit as required by this act, or in any case where safety regulations are being violated or where the public welfare or safety calls for the immediate halt of the operation until corrective steps have been started by the operator to the satisfaction of the mine conservation inspector.

As it was then in effect, section 4.3's terms, for the most part, conferred powers rather than duties. The legislature vested the secretary of DER with discretion to suspend a mining operator's license for noncompliance and vested inspectors with the authority—but not an absolute obligation—to order the immediate cessation of mining operations under certain enumerated circumstances. The legislature described only two non-discretionary functions, that an inspector report instances of non-compliance to the secretary and that the secretary notify the operator of his failure to comply.

Although the EHB did not make findings with regard to whether or not DER's inspectors failed to report instances of non-compliance to the secretary, we note that Ohio Farmers had the burden of proving DER's negligence and that the record is devoid of testimony or documentary evidence that mining inspectors failed to monitor the Veon company or report their findings to the secretary between 1977 and 1979. Indeed, although Mr. Veon testified that inspectors would not monitor the sites on a regular basis but intentionally would arrive unannounced at irregular intervals, he also testified that all three inspectors visited the Veon pits, and that the company may have been the subject of an enforcement action as early as late 1978 or early 1979. From the record, it appears that the only period of potentially lax monitoring activity may have occurred during Inspector Meehan's

tenure; however, Ohio Farmers did not call him as a witness or provide any evidence that he failed to report instances of non-compliance to DER.

Finally, Ohio Farmers has failed to direct our attention to any provision in the Act which requires enforcement action beyond that which DER appears to have taken here. *Cf. American Casualty Co. v. Department of Environmental Resources,* 65 Pa. Commonwealth Ct. 223, 441 A.2d 1383, 1388 (1982) (DER owed surety no duty of active diligence beyond that actually required by Anthracite Act).[9]

In *City of Harrisburg v. Guiles,* 192 Pa. 191, 44 A. 50 (1899), our Supreme Court rejected an argument similar to the one advanced here by Ohio Farmers, noting that a surety is not relieved of its obligations even in a situation where a government has been indifferent to negligent enforcement of the law:

> Both [Harrisburg and tax collector Guiles] were alike to blame, but neither can be found to have been guilty of fraud or crime. At the most, there were serious irregularities, but of these the city was under no obligation to notify the sureties. It was precisely against such lapses that the sureties' obligation was intended to protect the city.

192 Pa. at 198-99, 44 A. at 51.

---

[9] Indeed, recognizing that DER cannot guarantee ever-vigilant enforcement, the legislature has armed adversely affected private citizens with the right to commence a civil action "to compel compliance with this act . . . against the department where there is alleged a failure of the department to perform any act which is not discretionary with the department or against any other person who is alleged to be in violation of any provision of this act. . . ." Section 18.3 of the Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. §1396.21(a).

Because Ohio Farmers has not met its burden of proving that DER failed to enforce the mining laws, we need not consider the insurance company's other discharge theories based on principles of suretyship and secured creditor law.

## Discharge Through Untimely Notification

Ohio Farmers also contends that its liability on the reclamation bonds has been discharged because, for almost two years, DER failed to notify Ohio Farmers of Veon's backfilling violations.

As noted by the EHB, this defense appears to be based on the theory that DER had a duty to give Ohio Farmers advance notice that Veon was in danger of default. Yet, it is well-recognized in Pennsylvania that "[u]nless so required by the contract itself, no demand or notice of default is required in order to fix the surety's liability." 35 P.L.E. Suretyship §60. *See Holmes v. Frost*, 125 Pa. 328, 17 A. 424 (1889).

Here, DER notified Ohio Farmers of Veon's default on February 13, 1980. Although DER did not provide Ohio Farmers with documents which might indicate that Veon was in violation of the Commonwealth's reclamation laws, Ohio Farmers presented no evidence that its suretyship contract obligated DER to give the insurance company advance notice of a possible default by Veon.[10]

---

[10] We are unpersuaded by Ohio Farmers' reliance upon section 124(2) of the Restatement of Security, which provides:

> Where, during the existence of the suretyship relation, the creditor discovers facts unknown to the surety which would give the surety the privilege of terminating his obligation to the creditor as to liability for subsequent defaults, and the creditor has reason to believe these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety without a violation of a confidential duty, the creditor has a duty to notify the surety, and breach of this duty is a defense to the surety except in respect of his liability for defaults which have occurred before such disclosure should have been made.

First, no witnesses testified for the insurance company; thus, we do not know if Ohio Farmers was, in fact, unaware of Veon's reclamation violations. Second, Ohio Farmers failed to introduce the bond or any underlying agreement which might indicate that Ohio Farmers had a "privilege of terminating . . . [its] obligation."

We therefore affirm the decision of the EHB, but with a modification as to the amount. Both parties agree that the EHB overstated the correct amount of Bond 435721 for Permit No. 40-19 (Curatola Pit) by $2,000. The correct amount for that bond should be $14,000, not $16,000. Therefore, the total amount in question here is $252,750. Our order will state that figure.

ORDER

Now, March 18, 1983, the order of the Environmental Hearing Board, dated August 25, 1981, is affirmed, subject to the modification that Ohio Farmers Insurance Company make full and prompt payment to DER in the amount of $252,750.